UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
FLORENCE DIVISION

| | | |
|---|---|---|
| JEFFREY WESTON, | ) | C/A No. 4:10-0107-JMC-TER |
| | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | REPORT AND RECOMMENDATION |
| v. | ) | |
| | ) | |
| WARDEN, PERRY CORRECTIONAL | ) | |
| INSTITUTION, | ) | |
| | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner, Jeffrey Weston ("Petitioner/Weston"), a *pro se* prisoner, seeks habeas relief

pursuant to 28 U.S.C. §2254.[1] This matter is before the Court on the Respondent's motion for

summary judgment  (document # 22).

The Petitioner filed this petition for a writ of habeas corpus on January 19, 2010. On June

11, 2010, the Respondent filed a motion for summary judgment, along with supporting

memorandum and exhibits.  The undersigned issued an Order filed June 16, 2010, pursuant to

Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), advising the Petitioner of the motion for

summary judgment procedure and the possible consequences if he failed to respond adequately.

Petitioner filed a response in opposition. (Doc.#30). On January 14, 2011, Petitioner filed a Motion

to Amend this Response in Opposition. (Doc. #34). In this motion, Petitioner stated that he did not

realize in his response in opposition to summary judgment that it stated he waived all issues in his

---

[1] This habeas corpus case was automatically referred to the undersigned United States
Magistrate Judge pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Rule 73.02,
DSC. Because this is a dispositive motion, this report and recommendation is entered for review
by the district judge.

petition with the exception of only "ground #6" as someone else prepared the response, and he just signed the document. Petitioner requested in the motion to amend his response to "delete waiver of any grounds" and insert in his response that "Petitioner objects to Respondent's Motion for Summary judgment in all particulars and Petitioner insists that there are issues of material fact in dispute which precludes summary judgment." (Doc. #34). This motion was granted by the court and it is noted that Petitioner asserts there are material issues of fact in dispute which precludes summary judgment.

## I.  PROCEDURAL HISTORY

The procedural history as set out by the Respondent has not been seriously disputed by the Petitioner. Therefore, the undisputed procedural history as stated by the Respondent is set forth herein.

Petitioner is currently confined at the McCormick Correctional Institution in the South Carolina Department of Corrections pursuant to orders of commitment from the Clerk of Richland County. Petitioner was indicted by the Richland County Grand Jury during the August 2000 Term of the Court of General Sessions for Murder (00-GS-40-54693). Petitioner was represented by Jack B. Swerling, Esquire. On March 27, 2003, Petitioner was tried by a jury and was convicted for Murder. The Honorable G. Thomas Cooper, Circuit Court Judge, sentenced Petitioner to forty (40) years confinement. (Tr. 1-918).

Petitioner timely filed a Notice of Appeal. On appeal, Petitioner was represented by Robert M. Dudek, Esquire, then-Assistant Appellate Defender with the South Carolina Office of Appellate Defense. Petitioner's direct appeal was perfected with the filing of a Final Brief of Appellant. In the

Final Brief, Petitioner asserted the following arguments:

1. Whether the court erred by allowing the appellant's missing mother's friend, Suzanne Allen, to testify that his mother's "state of mind" changed from "happy" to "very unhappy" when appellant came to live with her, since this evidence directly tying her "state of mind" to appellant was not admissible under <u>State v. Garcia</u> as the solicitor alleged?

2. Whether the court erred by allowing appellant's sister, Toni, to testify their mother became nervous and anxious when appellant was around, and that her mother was afraid of appellant, and that her mother told Toni not to touch anything in appellant's room since this testimony was not admissible under Rule 803 (3), SCRE, and was inadmissible hearsay?

3. Whether the court erred by allowing the solicitor to ask apartment manager Fuller if anyone other than appellant had any animosity towards his mother since this was an improper question since the solicitor was injecting her "testimony" or conjecture into the trial without a proper foundation?

4. Whether the court erred by allowing police officer Jarvis to testify that in her years in law enforcement people usually answered her questions, and that appellant was the first person to stare "blankly" at her and not "answer anything," since Jarvis' opinion on how other people acted in the past while being interviewed compared to appellant's reaction was inadmissible, and was highly prejudicial?

5. Whether the court erred by allowing witness Perna to testify that appellant said "I need a lawyer" when he read a search warrant the police left inside his storage unit since this was a direct comment on appellant's right to an attorney, and it also should have been excluded under Rule 403, SCRE because its probative value was substantially outweighed by its prejudicial effect?

6. Whether the court erred by refusing to direct a verdict of acquittal since there was not any substantial circumstantial evidence if appellant's mother died, and died at the hands of another, that appellant killed her, since the state's evidence only raised a suspicion of his guilt, and a directed verdict should have been granted under these circumstances?

(Final Brief of Appellant).

The State filed a Final Brief of Respondent on June 21, 2005. Assistant Attorney General Jeffrey

A. Jacobs represented the State on brief, while Senior Assistant William Edgar Salter, III, argued

the case on direct appeal.

On January 17, 2006, the South Carolina Supreme Court filed a published Opinion affirming Petitioner's conviction and sentence. State v. Jeffery Weston, Op. No. 26099 (S.C. S.Ct., Jan. 17, 2006). The Court sent the Remittitur to the Richland County Clerk of Court on February 6, 2006.

Petitioner filed a pro se Post-Conviction Relief (PCR) Application (06-CP-40-06115) on October 17, 2006. He alleged the following grounds for relief in his Application:

1.   Ineffective assistance of trial counsel in that:

   a.   trial counsel failed to adequately investigate and prepare the case prior to trial;

   b.   trial counsel failed to adequately prepare and present witnesses at trial;

   c.   trial counsel failed to recognize and present objections to errors which occurred at trial; and,

   d.   trial counsel failed to develop and present viable defenses to the charges against Applicant prior to and during his trial.

2.   Ineffective assistance of appellate counsel for failing to recognize and present meritorious appellate issues to the Supreme Court.

App. 922-30. The State filed its Return on April 19, 2007. App. 931-36.

The Honorable Alison Renee Lee held an evidentiary hearing into the matter on January 29, 2008, at the Richland County Courthouse. Petitioner was present at the hearing, and Bryan Jeffries, Esquire, represented him. Assistant Attorney General Brian T. Petrano represented the State. Petitioner testified on his own behalf, while the State presented the testimony of trial counsel, Mr. Swerling. App. 937-1015.

At the hearing, Petitioner only proceeded on two main allegations of ineffective assistance of trial counsel: (1) trial counsel failed to have Petitioner evaluated by the South Carolina

4

Department of Mental Health (DMH); and (2) trial counsel failed to properly advise Petitioner regarding a potential plea offer. App 937-1008; 1019.

On July 9, 2009, Judge Lee filed an Order of Dismissal, in which she denied relief and dismissed the Application with prejudice. Judge Lee's Order of Dismissal addressed the Petitioner's claims that trial counsel was ineffective for failing to properly advise Petitioner and "allow" him to plead guilty to voluntary manslaughter; and that trial counsel was ineffective for failing to have Petitioner's competency evaluated by the South Carolina Department of Mental Health. App. 1018-28.

Petitioner timely served and filed a notice of appeal. Assistant Appellate Defender LaNelle C. Durant represented him in collateral appellate proceedings. Petitioner filed a Petition for Writ of Certiorari on November 3, 2008, in which he presented the following issues:

I.      Did the PCR court err in failing to find trial counsel ineffective for not having petitioner evaluated by the Department of Mental Health?

2.      Did the PCR court err in failing to find trial counsel ineffective for not advising petitioner to take the plea offer of voluntary manslaughter?

3.      Did the PCR court err in failing to find trial counsel ineffective for not allowing petitioner to testify at trial?

Petition, p. 2.

The State filed a Return to Petition for Writ of Certiorari on March 20, 2009.

The South Carolina Supreme Court filed an Order denying certiorari on November 4, 2009. It sent the Remittitur to the Richland County Clerk of Court on November 23, 2009. (Final Brief of Appellant).

## II.  FACTUAL HISTORY

The factual history as set forth in the Order of the State Supreme Court from Petitioner's

Direct Appeal will be set forth herein:

In late 1997, at age 38, Weston went to live with his mother, Frances Franchey, at her Harbison apartment. Franchey, in her late seventies, was a retired educator. According to Franchey's friends, during the months Weston lived with her, she became "very depressed, down, sad, agitated, nervous, very upset." The manager of the apartment complex testified that Franchey did not want Weston to live with her and was terrified of him. Shortly before her disappearance, Franchey talked about having Weston move out of her apartment. On Tuesday, August 4, 1998, Franchey told her bridge partner, Suzanne Allen, she was going to ask Weston to leave.

Franchey was last seen alive on August 6, 1998. That same day, Mark Jordan, the maintenance supervisor for the apartment complex, noticed that the trunk to Mrs. Franchey's car was open, and was lined with clear plastic. Jordan testified he had never seen Weston driving Franchey's vehicle prior to her disappearance, but that Weston was driving it on Monday, August 10. Jordan also testified that Franchey did not want bumper stickers on her car but that, shortly after her disappearance, a new bumper sticker appeared on the car which read, "My kid beat up your honor roll student."

Randy Myers, a resident of the apartment complex, testified that, at 4:30 a.m. on Saturday, August 8, he saw Weston loading garbage bags into the trunk of Franchey's car. The same day, Leslie Fuller, the apartment complex manager, received a phone call from a concerned friend of Franchey. Fuller went to check on Franchey and, receiving no answer, she went around back to the patio where she saw that all of Franchey's plants were turned over, and there was an empty bleach bottle on the porch. The next day, Fuller called Kathy Jarvis, a Richland County sheriff's deputy who lived at the complex and worked as its courtesy officer. Fuller and Jarvis went to the apartment and found Weston home. They saw Franchey's purse and glasses on her bed and were told by Weston that Franchey had "met some man and run off with him" leaving him a note on the coffee table. According to Fuller, Weston came into her office a day or two later, very disheveled, sweating profusely, his eyes huge, and stated, "I was really angry with my mother and now I'm just scared."

On Monday, August 10, Kathy Jarvis filed a missing person's report. The same day, a Richland County sheriff's deputy, Michael Kalec, went to the apartment and spoke with Weston. At that time, Kalec noticed there was no curtain in Franchey's bathroom. Weston advised Kalec that his mother's purse and keys were missing. Kathy Jarvis went to the apartment with police investigators on August 12 and noticed Franchey's purse was on the bed; she also noticed a brand new shower curtain was hanging in Franchey's bathroom.

6

The sheriff's department continued its investigation throughout the month of August. On September 4, they returned to the apartment, which Weston had since vacated, and saw that the linoleum in the kitchen had been torn out, as well as a piece of the living room carpet. An area rug was covering the hole in the carpet. It was not torn out by either the sheriff's department or apartment complex personnel. Police tested the floor where the linoleum had been removed and found blood; blood was also found on drag marks leading from the hole in the carpet investigators subsequently tested a piece of blood-stained molding from the apartment; the blood on the molding was Franchey's.

On August 9, 2000, Weston was indicted for the murder of his mother; he was apprehended in Seattle Washington in October 2000. The defense put up no evidence at trial. The jury found Weston guilty, and he was sentenced to forty years imprisonment.

(Order of Supreme Court of South Carolina filed February 17, 2006).

At the PCR hearing, Petitioner testified as to the details involving his mother's death. In the Order of dismissal, the PCR court set forth "the nature of the Applicant's testimony at the PCR hearing was quite extraordinary. Rather than attempt to paraphrase it; the following reflects the bulk of the Applicant's testimony as contained in the transcript . . . " The following was taken from the PCR court's order of Dismissal and the transcript from the PCR hearing:

> I had left Connecticut and come stayed with my mother. I'd had some problems in Connecticut. I had a nervous breakdown and had been arrested. I was on probation. I came down to the State of South Carolina and stayed with my mother for about a year prior to her disappearance.

> I'm sorry.

> I–anyway, in early–I stayed with her–I first came to stay with my mother in about July of 1997. In early 1998 I stopped taking my medication. The doctor did not know that I just stopped it on my own. I felt the medication slowed me down. And I also thought it affected my sex drive. There was a girl I saw once in a while–I didn't like that, the sex drive being affected. So I took myself off all medication, which I realize now was a huge, colossal mistake. One of the worst mistakes I've ever made in my life.

Anyway, on the morning of August the 6th, 1998 which was a Thursday, I - - I remember I called in sick to my employers at Target on Decker Boulevard. The reason I called in sick was because I had to meet with my probation agent, Vicky Sakes. But I didn't want to tell my employers I was on probation, so I told them that I just–that I was calling in sick.

I saw my probation agent, and then I just took the rest of the day off. I went around downtown Columbia. Got something to eat. I went out to one of the malls, Columbia Mall. And then I came back home–it was in the late afternoon.

My mother, Frances Franchey, we–we had dinner that evening. At first everything was fine. My mother was an alcoholic. My father was an alcoholic. And I'm an alcoholic. That kind of thing, of course, runs in families–families.

My mother was drinking that day. And we got into an argument. And I honestly don't remember what the argument was about. It started as something stupid and trivial and escalated into something horrible.

My mother and I–there was name calling, there was yelling. She got in my face and she–I never seen her this angry before. She had–it was like her mouth was starting to foam. And at one point some saliva came out of her mouth and hit me in the face, and I cursed her.

And at that point she hit me. Now. I'm wearing glasses now. But at that point—at that point I was wearing contact lenses. And my mom hit me. My mom was right handed. She hit me in my left eye, which it hurt like the dickens. And–and as a matter of fact, a little bit later it caused a black eye, which would later be noticed by people I worked with and the police.

In reflex action, Your honor, I–I did like this. I just with both hands I pushed her, and she fell backwards. And she hit her head on the dining room table. And she seemed to go into a brief seizure or spasm, and she–then she didn't move.

And I remember trying to take her pulse, holding her wrist, and there was no pulse. I remember putting my hand on her throat to try to get the pulse there. There still was no pulse.

I remember I shook her by the shoulder. I did her in the face, sort of–tap, slap–patted her on the face like that to try to get a response.

I said, Frances, Mom, are you all right? can you–can you hear me? Please–please say something. Please speak to me. Say something.

And, of course, she didn't say anything.

And so then I–I–I oh, I remember I got–I spoke into her–I got down and spoke into her ear. I said, Mom can you please say something can you please speak to me? Please tell me something. Say something.

She wouldn't–she didn't–couldn't answer. And then I went to her bedroom. I got a small hand-held mirror. I held it over her nose and mouth to try to see if any breath, any condensation would form on the mirror and it didn't. And she wasn't breathing. And she was dead.

And I just walked around the apartment in a total panic. I couldn't–I couldn't–I just kept saying, oh my God. What have I done? What have I done? Please, God, don't let this happen.

So she–I–I–remember–I sat down. And then I got up and I just—oh, I–I–I just wanted to make the situation go away. I just wanted to make it go way. I–I took her by her shoulders. I pulled her from where she fell in through the kitchen area into the utility closet, which is where the washer and dryer were located, and I closed the door. I just wanted to make the situation go away.

Then I remember–I remember I saw that there was blood on the carpet where she had fallen next to the dining table. I got a utility knife. I cut the–a hole, a big hole in the utility knife–in the carpet with the utility knife. I cut a big hole in the carpet. And I pulled it out and I put it in the utility room with Frances

. . .

So then I came back to the apartment. And I was hoping that maybe–I was hoping, praying that the whole thing had just been a hallucination or my imagination, because like I say, I've been diagnosed as schizophrenic. I hear voices when I'm not on my medication. I–I see things that aren't there, I have hallucinations. And so I came into the apartment hoping that she'd be sitting in her chair, she'd be asleep in her bed. And, of course, that was not the case. She was still in the utility room where I'd left her, still dead, of course.

I remember I went to –I–I–I–I sat down in the living room that night and, of course, I couldn't sleep. I'd just killed someone. I'd just killed

9

my own mother. And I was–I was–I couldn't–couldn't sleep, of course. So I just sat there thinking about how I could make the whole situation go away.

And by the next morning I'd come to the conclusion that I had to hide the body.

I remember after when I realized Frances was dead, right after she hit the table, I did have my hand on the telephone. I was going to call 9-1-1. But then my paranoia kicked in. I was in the grip of total fear and panic and I –all I could–I was scared. And–and I was afraid of what the police would do to me. I even was thinking that maybe the police would come in and shoot me and kill me when they saw what I had one.

And even though it was an accident–I swear to God, your honor, it was an accident. I did not mean to kill Frances Franchey, my Mother.

(Tr. 1019-1022).

Petitioner proceeded to testify as to how he dismembered his mother's body as follows:

But by the next morning I realized I–I figure I had to––I realize it was a mistake now, but I figure I had to hide the body. So first I called in sick to target. And my supervisor said, well, you know, this is the second day you've called in sick.

I said, yes, I'm sorry.

She said, all right. I'll see you Monday. This is Friday, August the 7th.

. . . I went over to the Lowe's or Home Depot and I got everything I figured I would need to–to do what I was—to conceal the body.

I bought a small rug to cover up the place that I'd cut out—the rug that I —the carpet that I'd cut out in the dining area. I bought three or

four plain plastic shower curtains.

Oh, I forgot to mention that when I came back in from walking the trails of Harbison Boulevard, I had—I remember I had—when I looked in the utility room and Frances was still there, I took the shower curtain down in her room. I just wanted–I just wanted to

10

cover her up, make the situation go away. So I threw the shower curtain over her.

Anyway, so the next morning I went to this Home Depot or Lowe's and I bought like three—I think five clear plastic shower curtain. I also bought a plain rug to put over that area of the carpet that I'd cut out.

. . .

Anyway, I waited until about–I also bought a saw. I bought some plastic garbage bags and a pair—plastic garbage bags and pair of gloves. And then I waited until–it was after midnight on Friday, so this would have been Saturday, August the 8th. And that was when I set about doing the most horrible, disgusting, sickening thing I'd ever done in my life.

I pulled my mother's body out of the utility room. She was on the shower curtain, and I pulled her out of that—out of the utility room. I pulled it into –through the kitchen, through the living room, and then I pulled it onto the back porch. And that is when I started to take the saw that I bought, and I started to dismember the body. I first cut her head off. And then–because I figure I'd have to do this to transport the body. So I–I remember–and then I started to–take–cut the legs off. But when the saw hit the leg bone, it was making too much noise and I was afraid it was going to–I was afraid it was going to wake the neighbors next door and they would come out and see what I was doing. Also I pulled the body back inside into the kitchen area, and that's where I finished dismembering the body.

And even though I had her on the shower curtain, there was blood all over the kitchen floor, which I later cleaned up with towels and stuff. But—and later I —that—that fear that there would be blood on the kitchen floor, I cut out the linoleum on the kitchen floor. But I did that a lot later, right before I left the apartment in late August of that year, later that some month.

So then I took—I took Frances' remains. I took the torso, I put it in a suitcase. I wrapped it up in plastic and I put it in a suitcase. Then I put the legs in another suitcase, wrapped them in plastic–plastic shower curtains. Then I put the head in a plastic bag, and then I took the towels and I put them—the towels I'd used to clean up the blood, and I took—put them in another plastic bag. And I - - and earlier that day—Friday afternoon I had put a plastic shower curtain in the trunk

11

of the car and lined it with plastic, because I knew I'd put the body there.

So I took everything, the suitcases and everything else. I put it in the trunk of the car and I closed the trunk. And it was shortly before dawn I drove my mother's car and I drove it to the place where I would bury the remains.

(Tr. 952-958).

Petitioner went on to testify how he buried the parts of her body in separate areas in the woods where he "got my arms scratched up. And those scratches would later be notice by–by witnesses—people I worked with and law enforcement." (Tr. 958). Petitioner testified that he went and got something to drink, went home and took a shower, went and bought some beer and Doritos, and went home and drank beer and ate chips until he passed out. (Tr. 959).

### III. HABEAS ALLEGATIONS

Petitioner filed his petition on January 19, 2010, in which Petitioner raises the following allegations, quoted verbatim:

GROUND ONE: The Trial Court erred by allowing witnesses to testify to evidence concerning the Petitioner's mother's state of mind, which denied Petitioner a fair trial.

SUPPORTING FACTS: There were witnesses that was allowed to testify about Ms. Franchey's demeanor and state of mind in the summer of 1998 when Petitioner moved into her apartment. This evidence directly tied the jury's attention to the victim's state of mind and not on the evidence to establish the fact that Petitioner had committed a crime. Thus, these testimonies were highly prejudicial to Petitioner receiving a fair trial.

GROUND TWO: The Trial Court erred by allowing the Solicitor to ask improper questions without a proper foundation,

12

which is a denial of a fair trial.

SUPPORTING FACTS: Ms. Fuller, a witness that testified in this trial, was allowed to testify and confirm her statement concerning her belief about Petitioner's feelings for his mother Ms. Franchey without an assertion of any basi[c] facts that would establish a foundation for such statement.

GROUND THREE: The Trial Court erred by allowing a Police Officer to testify to her opinion concerning the way Petitioner acted compared to the way other people act during an interview, which was highly prejudicial and denied Petitioner a fair trial.

SUPPORTING FACTS: Officer Jarvis testified at Petitioner's trial as to her opinion about h[er] concerns about Ms. Franchey. However, the defense objected on the basis that this was an opinion, but the trial judge overruled this objection. Ms. Jarvis was not qualified as an expert witness in interviewing or interrogating witness, thereby only forming her own opinion of Petitioner's mental state of being.

GROUND FOUR: Denial of a fair trial, when Trial Court allowed a witness to testify concerning a comment that Petitioner made which was prejudicial in effect.

SUPPORTING FACTS: Petitioner's landlord Mr. Perna was a witness that testified in this trial that was allowed to testify to a comment that Petitioner made concerning his constitutional right to an attorney. This comment was used to inflame the mind of the jurors. Therefore, the use of this comment for a probative effect to show Petitioner's state of mind was clearly prejudicial and outweighed its probative value.

GROUND FIVE: Denial of Due Process, where the Trial Court erred by refusing to direct a verdict of acquittal.

SUPPORTING FACTS: At the end of trial, defense counsel moved for a directed verdict, due to the fact the State failed to present evidence that would establish beyond a reasonable doubt that Petitioner committed a crime

13

and also failed to prove the corpus delicti. The State only presented evidence of mere suspicion and mere conjecture of a crime ever taken place. Therefore, allowing this case to be presented to the jury for a verdict upon mere suspicion of a crime being committed is a violation of Due Process.

GROUND SIX:                  Ineffective Assistance of Counsel for not having Petitioner evaluated by the Mental Health Department.

SUPPORTING FACTS:            Petitioner had a mental health problem from his early childhood years. Counsel knew about his issue but failed to present it to the trial court. Indeed, counsel had Petitioner evaluated by a private forensic psychiatrist for about an hour session and one that reviewed the medical records. However, by counsel not requesting a Blair Hearing, Petitioner was forced to stand trial on short period evaluation instead of full blown (complete) evaluation that would have revealed that Petitioner's situation was for a guilty but mentally ill plea, a plea of not guilty by reason of insanity or that Petitioner was incompetent to stand trial at that time.

GROUND SEVEN:               Counsel was Ineffective for not advising Petitioner to take the plea offer of Voluntary Manslaughter.

SUPPORTING FACTS:            Counsel Swerling knew that the State had offered a plea agreement to Counsel Hiskar for Petitioner to plead guilty but mentally ill to voluntary manslaughter. However, Counsel Swerling was so interested in the publicity from the media concerning this case, that he advised Petitioner not to listen to Steve. Therefore, Counsel Swerling was ineffective for advising Petitioner not to listen to his other Counsel Hiskar about the plea offer and proceed to trial. Because this was in the best interest of Petitioner.

GROUND EIGHT:               Counsel was Ineffective for not allowing Petitioner to testify at trial.

SUPPORTING FACTS:            Petitioner had consulted with Counsel Swerling about

14

testifying in his own behalf. But counsel told him that he was not going to be part of a stupid defense so Petitioner did not testify at trial. Moreover, Counsel Swerling admitted that Petitioner's story would have been an accident defense if the jury believed it. However. Counsel did not want Petitioner to testify as evidenced by his comments about Petitioner's poor performance on cross examination. Thus, if the jury could have heard Petitioner's story then there was a reasonable probability that he could have been convicted of a lesser included charge.

GROUND NINE:    Counsel was ineffective when he failed to move for a change of venue.

SUPPORTING FACTS:    There was an overwhelming amount of pre-trial publicity and publicity during the course of Petitioner's trial on television, newspaper, radio and the internet. With all of this publicity poisoning the jury pool it was impossible for Petitioner to get a fair and impartial jury and therefore impossible to receive a fair trial. A change of venue should have been requested by trial counsel Jack Swerling and should have been ordered by Judge G. Thomas Cooper. Petitioner asked his attorney Jack Swerling to request change of venue but attorney Swerling did not do so.

GROUND TEN:    Counsel was ineffective for not moving to sequester the jury.

SUPPORTING FACTS:    During the course of Petitioner's trial from May 27 through May 30, 2003. The jury was not sequestered thus allowing the jury to go home and be exposed to extensive media coverage and to talk about and discuss the case with friends, family members, etc. Even though the trial judge instructed the jury to refrain from watching, listening or reading any news media coverage about the case and to not discuss the case outside the courtroom, human nature being what it is, it is quite likely that some members of the jury did watch, listen to, and/or read news media coverage about the trial including issues in the courtroom argued by prosecution and defense attorneys outside the jury's presence while the jury was out of the

courtroom. And to discuss same with family and friends who watched media coverage. If even one of the jury members did this, it could destroy defendant Petitioner's chance for a fair and impartial trial jury, and therefor destroy Petitioner's chance for a fair trial. Petitioner asked his attorney Jack Swerling to have jury sequestered but attorney Swerling did not make motion to the Court to sequester the jury.

GROUND ELEVEN:

Trial court erred by not sequestering the witnesses during trial.

SUPPORTING FACTS:

Defense attorney Jack Swerling did request the Court to have prosecution witnesses sequestered but Judge G. Thomas Cooper denied this request. Prosecution witnesses were allowed to sit in courtroom throughout the course of the trial, listening to, and listening to, and gleaning information from each others testimony. Therefore witnesses were allowed to sit in courtroom and listen to and glean information from witnesses who had already testified thus contaminating and tainting those witnesses and their testimony. This destroys Petitioner's ability to a fair trial.

GROUND TWELVE:

Counsel was ineffective for failing to motion that the cameras should have been left out of the trial.

SUPPORTING FACTS:

A video camera was in the courtroom throughout the course of Petitioner's trial for murder. This added to the media circus atmosphere that permeated the trial affecting the jury and damaging Petitioner's ability to get a fair trial. Petitioner asked defense attorney Jack Swerling to request and make motion to the Court to have cameras kept out of courtroom. But attorney Swerling (a celebrity lawyer who revels in the media attention) never made the motion.

GROUND THIRTEEN:

Counsel was ineffective for failing to properly object that Richland County Sheriff's Deputy Kathy Jarvis gave unqualified expert testimony.

SUPPORTING FACTS:

Trial counsel Jack Swerling did not properly object that Richland County Sheriff's deputy, Kathy Jarvis gave unqualified expert testimony. The only objection

trial counsel Swerling raised was that Deputy Jarvis was giving her opinion. Therefore, the issue raised by Petitioner's appellate counsel, Robert Dudek pertaining to the fact that Deputy Jarvis gave unqualified expert testimony was procedurally barred from review because it differed from the objection raised at trial.

GROUND FOURTEEN:     The Trial Court erred by not removing the Fifth Circuit Solicitors Office from prosecuting the case against Petitioner as the Trial Court should have due to a conflict of interests.

SUPPORTING FACTS:     Petitioner had originally been represented in the murder case against him by the Richland County Public Defender's Office (before Petitioner hired the Swerling Law Firm). Attorneys in the Public Defender's Office who represented Petitioner included Ms. Lesley Coggiola, Esq., Mr. Douglas Strickler, Esq., and Ms. Jill Anders, Esq. Ms. Jill Anders had been working with Petitioner's attorney, Douglas Strickler right before Petitioner hired the Swerling Law Firm. Ms. Anders had visited Petitioner while Petitioner was being held in Richland County Detention Center along with Mr. Lesley Coggiola (who was Chief Public Defender at that time). Ms. Anders was present while Ms. Coggiola discussed highly sensitive and confidential matters with Petitioner, and took part in discussing these maters with Petitioner herself. Ms. Jill Anders had access to more highly sensitive and confidential information about the Petitioner while working for the Public Defender's Office who were working on Petitioner's case. Later, before Petitioner went to trial, Ms. Jill Anders left the Richland County Public Defender's Office and went to work for the Fifth Circuit Solicitor's Office, the same agency prosecuting Petitioner. Ms. Jill Anders was working for the Fifth Circuit Solicitor's Office for some time prior to, and during the Petitioner's trial for murder, giving Ms. Anders ample opportunity to share the highly sensitive and confidential information she had acquired while working for the Public Defender's Office, with members of the Fifth Circuit Solicitor's

17

who were prosecuting the Petitioner. This came to the attention of Petitioner's trial counsel, Jack Swerling, shortly (about a week) before Petitioner's trial. Trial counsel Swerling made a motion to the court that the Fifth Circuit Solicitor's Office should be removed from and not prosecute Petitioner's case due to the conflict of interests, and that some other agency should prosecute the case against Petitioner. An in camera hearing was held on trial counsel Swerling's motion in front of Judge G. Thomas Cooper, Jr. (Petitioner's Trial Court Judge) about a week before the start of Petitioner's trial. Judge Cooper denied trial counsel Swerling's motion, allowing the Fifth Circuit Solicitor's Office to prosecute Petitioner's case. Thus allowing the Solicitor's Office to use the highly sensitive and confidential information about Petitioner they obtained from Ms. Jill Anders, Esq., information they should have never had been privy to, to prosecute and subsequently convict Petitioner for murder which  denied Petitioner a fair trial.

GROUND FIFTEEN:          Petitioner received ineffective Assistance of Counsel in that trial counsel Swerling was ineffective when he did not give copies of all discovery materials to Petitioner before the start of trial.

SUPPORTING FACTS:          Petitioner did not receive copies of all discovery material before the start of trial. Trial Counsel Swerling did give Petitioner some of the discovery material before trial but not all of it. The Solicitor's Office held back some of the discovery material until right before the start of trial, then turned it over to trial counsel. But that discovery material was never turned over to Petitioner by trial counsel for Petitioner to view and study. Therefore there were witnesses and evidence presented at trial by the Solicitor's office that Petitioner knew nothing of and was completely unprepared for. When Petitioner saw these witnesses and evidence presented at trial, it was too late for Petitioner to go over this information and discuss it with trial counsel. This destroys Petitioner's right to a fair trial.

GROUND SIXTEEN:          Trial counsel was ineffective for failing to properly

18

prepare, investigate, and research prosecution witnesses before Petitioner's trial and for failing to perform a diligent or even adequate cross examination of prosecution witness at Petitioner's trial.

SUPPORTING FACTS:    The prosecution presented witness, Ms. Toni E. Franchey who was the estranged sister of Petitioner and daughter of Ms. Frances Franchey (whom Petitioner was charged with murdering). Ms. Toni Franchey gave a lot of very damaging testimony against Petitioner at trial. Making numerous false statements and testifying to things that she could not possibly know as facts (such as her claim that Petitioner did not have a driver's license, which was untrue) since she and Petitioner were estranged and had not seen, spoken to, written, or communicated with each other for more than 20 years prior to the disappearance of their mother, Frances Franchey. Nor had they communicated after their mother's disappearance. After Toni Franchey's testimony under direct examination by Prosecution, trial counsel Swerling did a very, very brief cross examination of Toni Franchey. After a few brief questions from trial counsel which Toni Franchey failed to answer or gave very unresponsive answers to, trial counsel Swerling literally gave up! Thus allowing the very damaging testimony Toni Franchey gave under direct examination by Prosecution to go virtually unchallenged. Toni Franchey's testimony against Petitioner included several damaging lies and false statements, which had trial counsel Swerling been more diligent and thorough in his cross examination, could have been proven to be the lies and false statements that they were. Trial counsel Swerling's weak and pathetic performance in investigating and preparing for the testimony of prosecution witness Toni Franchey, as well as trial counsel's weak and pathetic cross examination of Toni Franchey denied Petitioner a fair trial.

GROUND SEVENTEEN:    Trial counsel was ineffective for failing to properly prepare investigate, and research prosecution witnesses before Petitioner's trial and not performing cross examination of prosecution witness at

19

Petitioner's trial. And for failing to obtain necessary documentation of facts that would have disproven claims made by prosecution at Petitioner's trial and present said documentation to jury. This denied Petitioner a fair trial.

SUPPORTING FACTS: Prosecution witness, Ms. Joanne W. Batchelor, employed by the South Carolina Dept. of Public Safety as a custodian of records, testified that Petitioner was issued his South Carolina driver's license on June 30, 1999. The point and the reason for this testimony was to show that when Petitioner was seen by witnesses driving the car belonging to his mother, Frances Franchey (whom Petitioner was accused of murdering) in August 1998 about the time she disappeared, that the Petitioner did not at that time have a South Carolina driver's license. The facts are that the Petitioner had been using his Connecticut driver's license for some time after coming to South Carolina and was using that Connecticut driver's license in August 1998 when he was seen driving his mother's car. Petitioner had just not bothered to obtain a South Carolina driver's license until June 30, 1999. It is not unusual or uncommon for people to use a driver's license from their former state of residence for some time after moving to another state. If trial counsel Jack Swerling had properly prepared, investigated, and researched the case prior to trial he would have seen Joanne W. Batchelor's name of the prosecution's witness list, found that her occupation was Custodian of Records for South Carolina Dept. Of Public Safety, and been properly prepared for Ms. Bachelors testimony and evidence presented along with it by the State. Trial counsel had he properly prepared would have gotten documentation from the State of Connecticut showing that Petitioner had a driver's license from that state before coming to South Carolina. Trial counsel did not do any of these things, and in fact did not cross examine Ms. Batchelor. Trial counsel could and should have cross examined Ms. Batchelor and asked her if Petitioner could have had a driver's license from another state and used that prior to June 30, 1999 (which he obtained his South Carolina driver's license) to which

Ms. Batchelor would have had to answer "yes." Trial counsel could and should have then entered into evidence documentation that Petitioner had a driver's license from Connecticut for some time prior to his obtaining his South Carolina driver's license on June 30, 1999. Trial counsel did not do any of this and did not cross examine Joanne W. Batchelor at Petitioner's trial. Thereby allowing Ms. Batchelor's very damaging testimony and evidence the prosecution presented along with it, along with prosecution's statements to the jury about Petitioner's not having a driver's license at the time he drove his mother's car to go completely unchallenged. This denied Petitioner a fair trial.

GROUND EIGHTEEN:      Trial counsel was ineffective for failing to properly prepare and investigate case before Petitioner's trial. And for failing to obtain necessary documentation of facts that would have disproven claims made by prosecution at trial and present said facts to the jury. This denied Petitioner a fair trial.

SUPPORTING FACTS:      At trial prosecution witnesses Richland County Sheriff's investigator, Lt. Howard Hughes testified that after the disappearance of Petitioner's mother, Frances Franchey, Petitioner had told police that he was planning to move to the Dentsville area of Richland County, but instead moved to Confederate Avenue in Columbia (Richland County), which is not in the Dentsville area. The Solicitor's Office made much of this, telling the jury that this showed Petitioner had attempted to mislead police as to where he was going, and so was attempting to hide from, and evade police when he moved to Confederate Ave. In fact, after Petitioner's mother had disappeared, Petitioner had planned to move to the Dentsville area but instead had wound up moving to 1107 Confederate Avenue, Apt. 2. It is important to note that the house next door to Petitioner on Confederate Ave. was owned and occupied by a uniformed Richland County deputy sheriff who parked a clearly marked sheriff's patrol car in front of his house. Petitioner's landlord pointed this out to Petitioner

21

before he moved in. This deputy sheriff being a clearly visible member of the same law enforcement agency the Solicitor's Office would later claim at trial, that the Petitioner was attempting to hide from and evade. Since this deputy sheriff wore his uniform going in and out of his home, and parked a clearly marked patrol car in front of his home, and Petitioner had been told by his new landlord. Francis John Perna, that a deputy sheriff lived next door before Petitioner moved in. This shows that Petitioner was not making any attempt to hide from or evade law enforcement as the prosecution claimed at trial. Trial counsel could and should have asked Lt. Howard Hughes and landlord Perna, about this during his cross examination of both at trial, but failed to do so. Trial counsel, Jack Swerling never mentioned these facts to the jury at trial, thus allowing the Prosecution's very damaging allegations that Petitioner was attempting to hide from and evade law enforcement to go unchallenged. This denied Petitioner a fair trial.

GROUND NINETEEN:    Trial counsel was ineffective for failing to properly prepare and investigate case before Petitioner's trial and failing obtain necessary documentation of facts and would have disproven claims made by prosecution at trial and presenting said documentation to jury.

SUPPORTING FACTS:    Prosecution brought up and made much of the fact that Petitioner had left South Carolina a little more than a year after the disappearance of his mother, Frances Franchey (whom he was charged with murdering) and had gone to New York and then Seattle, Washington. Telling the jury that Petitioner had done this in an attempt to hide from and evade law enforcement. The fact is that Petitioner did leave South Carolina in September 1999 (a little over a year after the disappearance of his mother) and stayed with a friend of his in Brooklyn, N.Y. for a month, then moved to Seattle, WA., where he lived and worked for a year before being arrested on a South Carolina Fugitive warrant for murder. Petitioner lived and worked in Seattle, WA under his real name and social

22

security number. Petitioner had his Social Security benefits check direct deposited in his Washington Mutual Bank account which was there in Seattle, WA under Petitioner's real name and social security number. Petitioner rented an apartment and a post office box where he received mail under his real name and social security number. Petitioner worked in Seattle, WA first for Greyhound Bus Lines, then for Diamond Parking Services, and was a member of Teamsters Union Local 117, all under his real name and social security number. Which shows that Petitioner was not living in Seattle, WA in an attempt to hide or evade law enforcement. Trial counsel, Jack Swerling could and should have obtained documentation of all of these facts and entered it into evidence in Court at Petitioner's trial to refute and disprove prosecution's claims that Petitioner had moved to Seattle, WA to hide from, and evade law enforcement. But trial counsel did not do any of this. Thus allowing prosecution's damaging claims to go unchallenged. This denied Petitioner a fair trial.

GROUND TWENTY:          Trial counsel was ineffective for failing to make a motion trial court Judge G. Thomas Cooper, Jr. to recuse himself as trial court judge at petitioner's trial, after Judge Cooper had been prejudiced against petitioner, and made remarks showing prejudice against petitioner during an in camera hearing before Petitioner's trial.

SUPPORTING FACTS:       On December 10, 2002 Petitioner had written a letter filled with hateful language and profanities to his trial counsel, Jack Swerling. As a result, trial counsel Swerling filed a motion to be relieved as counsel in petitioner's case. On December 20, 2002 Petitioner was brought before the court for an in camera hearing on counsel Swerling's motion in front of Judge G. Thomas Cooper, Jr. (Who would preside as trial judge over petitioner's trial in May 2003). Note (before the start of this in camera hearing counsel Swerling met privately with petitioner and attempted to get petitioner to sign papers voluntarily relieving counsel Swerling as his attorney. He also informed petitioner that he would not refund any of the money petitioner

23

had paid him. Petitioner refused to sign said papers). At the in camera hearing counsel Swerling handed the belligerent profanity filled letter Petitioner had written him to Judge Cooper so Cooper could read it. Judge Cooper read the letter, some of it out loud, and made several remarks voicing his anger and disapproval toward petitioner and the letter petitioner had written to counsel Swerling. Petitioner said that he regretted writing the letter, and said he had done so because of his mental illness, schizophrenia. Judge Cooper said that he thought the letter had been written not because of mental illness, but because of "meanness" on the part of the petitioner. Note (one of the prosecutors on petitioner's case, Katherine Luck Campbell was present at the in camera hearing and heard everything that was said). At the end of the in camera hearing, counsel Swerling told the Petitioner and the court that if the petitioner would write a letter of apology to him (counsel Swerling) that he would stay on the case and continue to represent petitioner. Feeling that he had no other choice, petitioner wrote the letter of apology Counsel Swerling had demanded. Counsel Swerling agreed to stay on as petitioner's attorney. Six months later, in May 2003, Judge G. Thomas Cooper, Jr. (Who had read the belligerent, profane letter Petitioner had written to counsel Swerling made angry comments toward petitioner calling his letter an act of "meanness") was the trial judge at petitioner's trial for murder, where petitioner was convicted and sentenced by Judge Cooper to 40 years in prison. Trial counsel Swerling who had requested the in camera hearing, had shown Judge Cooper the belligerent, profane letter petitioner had written to him, and saw how the letter had clearly angered and prejudiced Judge Cooper against Petitioner should have made motion to have Judge Cooper recuse himself as trial Judge from petitioner's trial. The fact that Judge G. Thomas Cooper, Jr. who had been clearly prejudiced against petitioner at the in-camera hearing in December 2002, later served as trial judge at petitioner's trial denied petitioner a fair trial.

(Petition).

## IV.  SUMMARY JUDGMENT

As stated above, the Respondent filed a return and memorandum of law in support of the motion for summary judgment.

The federal court is charged with liberally construing the complaints filed by pro se litigants, to allow them to fully develop potentially meritorious cases.  See Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972).  The court's function, however, is not to decide issues of fact, but to decide whether there is an issue of fact to be tried.  The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim,  Weller v. Dep't of Social Servs., 901 F.2d 387 (4th Cir. 1990), nor can the court  assume the existence of a genuine issue of material fact where none exists.   If none can be shown, the motion should be granted.  Fed. R. Civ. P. 56(c).

The moving party bears the burden of showing that summary judgment is proper.  Summary judgment is proper if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Summary judgment is proper if the non-moving party fails to establish an essential element of any cause of action upon which the non-moving party has the burden of proof.  Celotex, 477 U.S. 317.  Once the moving party has brought into question whether there is a genuine dispute for trial on a material element of the non-moving party's claims, the non-moving party bears the burden of coming forward with specific facts which show a genuine dispute for trial.  Fed.R.Civ.P. 56(e); Matsushita Electrical Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  The non-moving party must come forward with enough evidence, beyond a mere scintilla, upon which the fact finder could reasonably find for it.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48

(1986).  The facts and inferences to be drawn therefrom must be viewed in the light most favorable to the non-moving party.  Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991).  However, the non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment.  Barber v. Hosp. Corp. of Am., 977 F.2d 874-75 (4th Cir. 1992).  The evidence relied on must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits."  Mitchell v. Data General Corp., 12 F.3d 1310, 1316 (4th Cir. 1993).

To show that a genuine dispute of material fact exists, a party may not rest upon the mere allegations or denials of his pleadings.  See Celotex, 477 U.S. at 324 (Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves).  Rather, the party must present evidence supporting his or her position through "depositions, answers to interrogatories, and admissions on file, together with ... affidavits, if any." Id. at 322; see also Cray Communications, Inc. v. Novatel Computer Systems, Inc., 33 F.3d 390 (4th Cir. 1994); Orsi v. Kickwood, 999 F.2d 86 (4th Cir. 1993); Local Rules 7.04, 7.05, D.S.C.

## V. STANDARD OF REVIEW

In addition to the standard that the court must employ in considering motions for summary judgment, the court must also consider the petition under the requirements set forth in 28 U.S.C. § 2254. Under § 2254(d),

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in the State court proceedings unless the adjudication of the claim-

(1) resulted in a decision that was contrary to, or involved an

26

unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the State court proceeding.

As "a determination of a factual issue made by a State court shall be presumed to be correct," a Petitioner has "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). With respect to reviewing the state court's application of federal law, " '[a] federal habeas court may grant the writ if the state court identifies the correct governing principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.'" Humphries v. Ozmint, 397 F.3d 206, 216 (4th Cir. 2005) (quoting Williams v. Taylor, 529 U.S. 362, 413 (2000)). Further, "an 'unreasonable application of federal law is different from an incorrect application of federal law,' because an incorrect application of federal law is not, in all instances, objectively unreasonable." Id. "Thus, to grant [a] habeas petition, [the court] must conclude that the state court's adjudication of his claims was not only incorrect, but that it was objectively unreasonable." McHone v. Polk, 392 F.3d 691, 719 (4th Cir. 2004).

## VI.  DISCUSSION AS TO PROCEDURAL BAR

### A.  Procedural Bar

Exhaustion and procedural bypass are separate theories which operate in a similar manner to require a habeas Petitioner to first submit his claims for relief to the state courts. The two theories rely on the same rationale. The general rule is that a Petitioner must present his claim to the highest state court with authority to decide the issue before the federal court will consider the claim.

### 1.  Exhaustion

The theory of exhaustion is based on the statute giving the federal court jurisdiction of habeas petitions.  Applications for writs of habeas corpus are governed by 28 U.S.C.§ 2254, which allows relief when a person "is in custody in violation of the Constitution or laws or treaties of the United States."  The statute states in part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court, shall not be granted unless it appears that

(A) the applicant has exhausted the remedies available in the courts of the State; or

(B)(I) there is either an absence of available State corrective process; or

(ii) circumstances exist that render such process, ineffective to protect the rights of the applicant.

(2)    An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

(3)    A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c)    An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

This statute clearly requires that an applicant pursue any and all opportunities in the state courts before seeking relief in the federal court. When subsections (b) and (c) are read in conjunction, it is clear that § 2254 requires a Petitioner to present any claim he has to the state courts before he can proceed on the claim in this court.

28

The United States Supreme Court has consistently enforced the exhaustion requirement.

> The exhaustion doctrine existed long before its codification by Congress in 1948. In <u>Ex parte Royall</u>, 117 U.S. 241,251 (1886), this Court wrote that as a matter of comity, federal courts should not consider a claim in a habeas corpus petition until after the state courts have had an opportunity to act . . .

<u>Rose v. Lundy</u>, 455 U.S. 509, 515 (1982).

In South Carolina, a person in custody has two primary means of attacking the validity of his conviction.  The first avenue is through a direct appeal and, pursuant to state law, he is required to state all his grounds in that appeal, <u>See</u> SCAR 207 and <u>Blakeley v. Rabon</u>, 266 S.C. 68,221 S.E.2d 767 (1976). The second avenue of relief is by filing an application for post-conviction relief (PCR). <u>See</u> S.C. Code Ann. §17-27-10 et seq. A PCR applicant is also required to state all of his grounds for relief in his application. <u>See</u>, S. C. Code Ann. § 17-27-90. Strict time deadlines govern direct appeal and the filing of a PCR in the South Carolina Courts. A PCR must be filed within one year of judgment, or if there is an appeal, within one year of the appellate court decision. S.C. Code Ann. § 17-27-45.

When the petition for habeas relief is filed in the federal court, a Petitioner may present only those issues which were presented to the South Carolina Supreme Court through direct appeal or through an appeal from the denial of the PCR application, whether or not the Supreme Court actually reached the merits of the claim. If any avenue of state relief is still available, the Petitioner must proceed through the state courts before requesting a writ of habeas corpus in the federal courts, <u>Patterson v. Leeke</u>, 556 F.2d 1168 (4th Cir. 1977) and <u>Richardson v. Turner</u>, 716 F.2d 1059 (4th Cir. 1983). However, if Petitioner has failed to raise the issue before the state courts, but still has any means to do so, he will be required to return to the state courts to exhaust the claims. <u>Rose</u> 455 U.S.

at 515.

## 2. Procedural bypass

Procedural bypass is the doctrine applied when the person seeking relief failed to raise the claim at the appropriate time in state court and has no further means of bringing that issue before the state courts. If this occurs, the person is procedurally barred from raising the issue in his federal habeas petition. The United States Supreme Court has clearly stated that the procedural bypass of a constitutional claim in earlier state proceedings forecloses consideration by the federal courts, Smith v. Murray, 477 U.S. 527, 533 (1986). Bypass can occur at any level of the state proceedings, if a state has procedural rules which bar its courts from considering claims not raised in a timely fashion. The two routes of appeal in South Carolina are described above, (i.e., direct appeal, appeal from PCR denial) and the South Carolina Supreme Court will refuse to consider claims raised in a second appeal which could have been raised at an earlier time. Further, if a prisoner has failed to file a direct appeal or a PCR and the deadlines for filing have passed, he is barred from proceeding in state court.

If the state courts have applied a procedural bar to a claim because of an earlier default in the state courts, the federal court honors that bar. State procedural rules promote

> . . . not only the accuracy and efficiency of judicial decisions, but also the finality of those decisions, by forcing the defendant to litigate all of his claims together, as quickly after trial as the docket will allow, and while the attention of the appellate court is focused on his case.

Reed v. Ross, 468 U.S. 1, 10-11 (1984).

Although the federal courts have the power to consider claims despite a state procedural bar,

30

> . . . the exercise of that power ordinarily is inappropriate unless the defendant succeeds in showing both "cause" for noncompliance with the state rule and "actual prejudice" resulting from the alleged constitutional violation.

Smith v. Murray, supra, quoting Wainwright v. Syke s, 433 U.S. at 84 (1977); see also Engle v. Isaac, 456 U.S. 107, 135 (1982).

Stated simply, if a federal habeas Petitioner can show (1) cause for his failure to raise the claim in the state courts, and (2) actual prejudice resulting from the failure, a procedural bar can be ignored and the federal court may consider the claim. Where a Petitioner has failed to comply with state procedural requirements and cannot make the required showing(s) of cause and prejudice, the federal courts generally decline to hear the claim. See Murray v. Carrier, 477 U.S.478, 496 (1986).

### 3.  Inter-relation of Exhaustion and Procedural Bypass

As a practical matter, if a Petitioner before this court has failed to raise a claim in state court, and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in the state courts and in federal court.  A federal court is barred from considering the  filed claim (absent a showing of cause and actual prejudice). In such an instance, the exhaustion requirement is technically met and the rules of procedural bar apply. Matthews v. Evatt, 105 F.3d 907 (4th Cir. 1997); cert.denied, 118 S.Ct. 102 (1997) citing Coleman v. Thompson, 501 U.S. 722, 735 n. 1 (1991); Teague v. Lane, 489 U.S. 288,297-98 (1989); and George v. Angelone, 100 F.3d 353,363 (4th Cir. 1996).

### 4.  Cause and Actual Prejudice

The requirement of exhaustion is not jurisdictional and this court may consider claims which have not been presented to the South Carolina Supreme Court in limited circumstances. Granberry v. Greer, 481 U.S. 129, 131 (1987). In order to have such claims considered, a Petitioner must show

31

sufficient cause for failure to raise the claim and actual prejudice resulting from the failure, Coleman v. Thompson, 501 U.S. at 750, or that a "fundamental miscarriage of justice" has occurred. Murray v. Carrier, 477 U.S. 478 (1986). A Petitioner may prove cause if he can demonstrate ineffective assistance of counsel relating to the default, show an external factor which hindered compliance with the state procedural rule, or demonstrate the novelty of a particular claim. Murray v. Carrier, 477 U.S. 478 (1986); Clozza v. Murray, 913 F.2d 1092 (4th Cir. 1990), cert. denied, 499 U.S. 913 (1991); and Clanton v. Muncy, 845 F.2d 1238 (4th Cir. 1988), cert. denied, 485 U.S. 1000 (1988).

Absent a showing of "cause," the court is not required to consider "actual prejudice." Turner v. Jabe, 58 F.3d 924 (4th Cir. 1995). However, if a Petitioner demonstrates sufficient cause, he must also show actual prejudice in order to excuse a default. Murray v. Carrier, 477 U.S. at 492. To show actual prejudice, the Petitioner must demonstrate more than plain error. He is required to prove that specific errors infected the trial and were of constitutional dimensions. United States v. Frady, 456 U.S. 152 (1982).

In the case of Kornahrens v. Evatt, 66 F.3d 1350 (4th Cir. 1995), cert. denied 517 U.S.1171 (1996), 116 S.Ct. 1575 (1996), the Court of Appeals stated that once a claim is determined to be procedurally barred, the court should not consider the issue on its merits. The Court noted that it is always tempting to discuss the merits as an alternative reason for a conclusion, but that once a court finds an issue to be procedurally barred, all discussion which follows is only dicta. See Karsten v. Kaiser Foundation Health Plan, 36 F.3d 8, 11 (4th Cir. 1993). Once a court has determined that a claim is procedurally barred, it should not stray into other considerations.

## VII. ANALYSIS

The Respondent submits that Petitioner has technically exhausted all available state remedies for these claims. Respondent contends that since Petitioner did not exhaust some of his claims, they are technically exhausted but subject to procedural bars.

## GROUND ONE

In Ground One, Petitioner asserts that the trial court erred "by allowing witnesses to testify to evidence concerning the Petitioner's mother's state of mind, which denied Petitioner a fair trial." Petitioner asserts that when several witnesses were permitted to testify about the victim's demeanor and state of mind when Petitioner moved into his mother's apartment, the evidence focused the jury on the victim's state of mind and was irrelevant to whether or not he was guilty of murder.

Respondent argues this issue should be dismissed because Petitioner fails to state a claim which federal habeas relief can be granted as federal habeas relief cannot rest upon a matter of state law. Respondent argues that Petitioner is "merely complaining about a violation of state evidentiary law, and federal habeas corpus relief is not available to correct errors of state law." (Def.'s bf. at 33).

A state court's decision on a question of state law is binding in federal court. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Thomas v. Davis, 192 F.3d 445, 449 n. 1 (4th Cir. 1999). Therefore, it is recommended that Ground One be dismissed and Respondent's motion for summary judgement be granted with respect to his issue.

## GROUND TWO

In Ground Two, Petitioner asserts the trial judge erred by permitting the State to introduce the testimony of his mother's apartment manager, Leslie Fuller, who testified that no-one other than her victim's son (plaintiff) had any animosity toward the victim.

Respondent argues this issue should be dismissed because Petitioner fails to state a claim which federal habeas relief can be granted as federal habeas relief cannot rest upon a matter of state law. Respondent argues that Petitioner is "merely complaining about a violation of state evidentiary law, and federal habeas corpus relief is not available to correct errors of state law."  (Def.'s bf. at 38).

A state court's decision on a question of state law is binding in federal court. See Estelle v. McGuire, supra; Thomas v. Davis, supra. Therefore, it is recommended that Ground Two be dismissed and Respondent's motion for summary judgement be granted with respect to his issue.


**GROUND THREE**

In Ground Three, Petitioner contends the trial judge erred in allowing officer Jarvis to testify

about Petitioner's lack concern for his mother, the victim, because this was opinion testimony. Specifically, Petitioner argues it was error to allow Deputy Jarvis to testify regarding her opinion that when she questioned plaintiff about his mother Petitioner did not show any concern about his mother.

Respondent argues this issue should be dismissed because Petitioner fails to state a claim which federal habeas relief can be granted as federal habeas relief cannot rest upon a matter of state law. Respondent argues that Petitioner is "merely complaining about a violation of state evidentiary

law, and federal habeas corpus relief is not available to correct errors of state law." (Def.'s bf. at 38).

A state court's decision on a question of state law is binding in federal court. See Estelle v. McGuire, supra; Thomas v. Davis, supra. Therefore, it is recommended that Ground Three be dismissed and Respondent's motion for summary judgement be granted with respect to his issue.


## GROUND FOUR

In Ground Four, Petitioner contends the trial judge denied him a fair trial by allowing the State to introduce the testimony from his landlord, Mr. Perna, about a comment Petitioner made concerning his constitutional right to an attorney.

Respondent asserts the state courts' rejection of Petitioner's claim was not "contrary to" and did not involve an "unreasonable application of clearly established United States Supreme Court precedent.

Petitioner raised this issue in his direct appeal. The South Carolina Supreme Court found no error stating as follows:

> Weston moved out of his mother's apartment the weekend of August 21, 1998, and moved into an apartment on Confederate Avenue, owned by his friend Francis Perna. Perna helped Weston move into the apartment, retrieving Weston's personal belongings both from the apartment in Harbison, and from a Public Storage unit on Broad River Road. When they arrived at the storage unit, they found a search warrant. Weston read the search warrant and said, "I need a lawyer."

> Weston asserts the trial court erred in allowing Perna to comment that he stated "I need a lawyer." He contends this was an improper comment on his right to an attorney and that, in any event, it was impermissible under Rule 403, SCRE, as its prejudice outweighed its probative value. We disagree and find Weston has not shown

reversible error from admission of this single comment.

In Doyle v. Ohio, 426 U.S. 610 (1976), the United States Supreme Court held that the due process clause of the Fourteenth Amendment is violated when a state prosecutor seeks to impeach a defendant's exculpatory story, told for the first time at the trial, by cross-examining him about his post-arrest silence after receiving Miranda warnings. Doyle also prohibits the State from commenting upon the defendant's request for an attorney. See Wainwright v. Greenfield, 474 U.S. 284 (1986); Edmond v. State, 341 S.C. 340, 345, 534 S.E.2d 682, 685 (2000). The rationale for Doyle is that it would be a violation of due process to allow comment on the silence which Miranda warnings have encouraged.

Subsequent to Doyle, in Fletcher v. Weir, 455 U.S. 603 (1982), the Supreme court clarified that Doyle was applicable only in situations in which the government had induced, via Miranda warnings, a defendant's belief that his exercise of a constitutional right would not be used against him. 455 U.S. at 607 ("in the absence of the sort of affirmative assurances embodied in the Miranda warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to post arrest silence when a defendant chooses to take the stand." See also State v. Bell, 347 S.C. 267, 554 S.E.2d 435 (Ct. App. 2001)(recognizing that Doyle is applicable only after Miranda warnings have been given).

Doyle is simply inapplicable here. Unlike Doyle, Weston was not under arrest at the time he told Perna that he needed a lawyer, nor had he been given Miranda warnings by authorities. Under Fletcher, it is clear Doyle is inapplicable to Weston's statement to his friend. Accord State v. Baccam, 476 N.W.2d 884, 886 (Iowa Ct. App. 1991).

(State v. Weston, supra).

Petitioner was not under arrest at the time he made the statement to Perna that he needed a lawyer, and had not been given any Miranda warnings. Further, Perna was a friend not a police officer, and Petitioner had not invoked his right to an attorney. Therefore, the state court's ruling was not "contrary to" or "unreasonable   application of" clearly established United States Supreme Court precedent. Also, to the extent Petitioner argues the statement should have been excluded under

state law, such claim is not cognizable her. See, Estaell, supra. Thus, it is recommended that Respondent's motion for summary judgement be granted with respect to Ground Four.

## GROUND FIVE

In Ground Five, Petitioner argues the trial judge denied him due process by refusing to direct a verdict of acquittal on the charge of murder.

Respondent disagrees and responds that the state courts' rejection of this claim was not "contrary to" and did not involve an "unreasonable application of clearly established United States Supreme Court precedent.

Since Petitioner's claim is based on a violation of state law, it goes to the sufficiency of the evidence. Such a claim is cognizable on collateral review, however, a federal court's review of such claims is "sharply limited." Wilson v. Greene, 155 F.3d 396, 405 (4th Cir.1998), *cert. denied,* 525 U.S. 1012 (1998)(quoting Wright v. West, 505 U.S. 277, 296 (1992)); see also Evans-Smith v. Taylor, 19 F.3d 899, 905 (4th Cir.1994)["The standard is obviously rigorous."] "Federal review of the sufficiency of the evidence to support a state conviction is not meant to consider anew the jury's guilt determination or to replace the state's system of direct appellate review." Wilson, 155 F.3d at 405-406 (*citing* Wright, 505 U.S. at 292). When reviewing such a claim, a federal court must consider circumstantial as well as direct evidence and allow the government the benefit of all reasonable inferences from the facts proven to the facts sought to be established; United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982); and when faced with all the evidence that allows conflicting inferences, this Court must presume that the jury resolved such conflicts in the state's favor. Jackson v. Virginia, 443 U.S. 307, 326 (1979). Therefore, Petitioner is entitled to relief only

if "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Wilson, 155

F.3d at 406 (quoting Jackson, 443 U.S. at 324)); see also George v. Angelone, 100 F.3d 353, 357

(4th Cir.1996); Bradley v. State, No. 04-1278, 2005 WL 3475770 at *6 (D.S.C. Apr. 5, 2005).

The Jackson standard "must be applied with explicit reference to the substantive elements

of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n. 16. Also, a federal

reviewing court "must consider circumstantial as well as direct evidence, and allow the government

the benefit of all reasonable inferences from the facts proven to those sought to be established."

United States v. Tresvant, 677 F.2d 1018, 1021 (4th Cir.1982). Further, "under Jackson, the

assessment of the credibility of witnesses is generally beyond the scope of review." Schlup v. Delo,

513 U.S. 298, 330, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). See also Jackson, 443 U.S. at 318-19

("[T]his inquiry does not require a court to 'ask itself whether it believes that the evidence at the trial

established guilt beyond a reasonable doubt.' ") (emphasis in original).

Applying this criteria to this, Petitioner was not entitled to a directed verdict on the charges

against him because, when the direct and circumstantial evidence is viewed in the light most

favorable to the prosecution, it cannot be said that "no rational trier of fact could have found proof

of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 324.

In its order on direct appeal, the South Carolina Supreme Court stated the following with

regard to this issue:

> Lastly, Weston contends the trial court erred in denying his motion for a directed
> verdict, claiming the state failed to prove the corpus delicti of a murder and that there
> was no evidence he caused Mrs. Franchey's death. We disagree and find the matter
> was properly submitted to the jury.
>
> When ruling on motion for a directed verdict, the trial court is concerned with the
> existence or nonexistence of evidence, not its weight. A defendant is entitled to a
> directed verdict when the state fails to produce evidence of the offense charged.

38

When reviewing a denial of a directed verdict, this Court views the evidence and all reasonable inferences in the light most favorable to the state. If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the Court must find the case was properly submitted to the jury. State v. Cherry, 361 S.C. 588, 593, 606 S.E.2d 475, 477-478 (2004). See also State v. Harris, 351 S.C. 643, 653, 572 S.E.2d 267, 273 (2002); State v. Gaster, 349 S.C. 545, 555, 564 S.E.2d 87, 92 (2002); State v. Venters, 300 S.C. 260, 264, 387 S.E.2d 270, 272-23 (1990).

Here, the state presented evidence that Mrs. Franchey had an active social life, was active with friends at bridge club, and regularly kept in touch with the apartment complex managers, her sister, and her friends. She was last seen on August 6, 1998, via a bank video, making a withdrawal from her bank account. She has not been seen nor heard from since. Under Owens, the state's presentation of the victim's habits, coupled with her mysterious disappearance, and the fact that she has not been seen nor heard from since August 1998, are sufficient to establish the corpus delicti of murder.

Further, the evidence presented by the state warranted submission of the case to the jury. Evidence was presented that Weston had gone to live with his mother in the fall of 1997, and that she became very upset and was depressed Weston was living with her. Friends and family advised Franchey to either change the locks, eject Weston, or find him another place to live. Two days before her disappearance, Franchey told a friend she had decided to tell Weston to leave. She was last seen alive on August 6, 1998. The same day the maintenance supervisor of the apartment complex noticed that the trunk to Mrs. Franchey's vehicle was open, and was lined with clear plastic. The maintenance supervisor also testified that Franchey, a retired educator, did not have any bumper stickers on her car but that, immediately after she disappeared, a sticker which read "My kid beat up your honor roll student" was on the car. The apartment manager testified that when she went to the apartment on August 8, the shower curtain in Franchey's bathroom was missing.

Randy Myers, an apartment complex resident, testified that at 4:30 a.m. on Saturday, August 8, he saw Weston loading garbage bags into the trunk of Franchey's car. Several people also testified that they had never seen Weston drive Franchey's car before, Weston did not have a driver's license, and that immediately after Franchey disappeared, Weston was driving her car.

The apartment complex manager testified that, when she went to check on Franchey, she saw that Franchey's plants on her back patio were turned over, and there was an empty bleach bottle on the porch. When initially confronted by the apartment complex manager and Officer Jarvis, Weston told them his mother had "met some man and run off with him" leaving him a note on the coffee table. No other witness had any knowledge of an alleged boyfriend. Further, although the apartment complex

manager and Jarvis remembered seeing Franchey's purse and glasses on her bed in the apartment on August 8, Weston told police that his mother's purse was missing. The apartment complex manager also testified that Weston came into her office a day or two later, very disheveled, sweating profusely, his eyes huge, and stated, "I was really angry with my mother and now I'm just scared."

Immediately after Franchey's disappearance, Weston called in sick to his job at Target for two days, saying he had a virus. He returned to work on Monday, August 10, and was seen by employees to have a limp, a bruise under his eye, and scratches on his arms. He told his supervisor his cat had scratched him. He told another co-worker he had stepped off a curb and fallen into some bushes. When Jarvis and the apartment manager spoke to Weston at Franchey's apartment, Weston was wearing a heavy black jacket on a hot August day such that his arms were not visible. When Weston went back to work at Target, he bought a new shower curtain, and a rug. When police investigate the apartment, they found an area rug covering a hole in the carpet of the living room floor. Linoleum in the kitchen floor had also been torn up and was missing. Police tested the floor where the linoleum had been removed and found blood; blood was also found on drag marks leading from the  hole in the carpet. Investigators subsequently tested a piece of blood-stained molding from the apartment which was determined to be Franchey's. Blood was also found on the rubber ring that lined the trunk of Franchey's car.

The above evidence, although circumstantial, is clearly sufficient to withstand a motion for a direct verdict. The judgment below is affirmed.

(State v. Weston, supra).

This Court's review of this claim is limited by the deferential standard of review set forth in 28 U.S.C. § 2254(d), as interpreted by the Supreme Court in Williams v. Taylor, supra; and Petitioner is entitled to relief only if no rational trier of fact could have found guilt beyond a reasonable doubt. Wilson, 155 F.3d at 406. Based upon a review of the evidence submitted at trial, the undersigned does not find that Petitioner has shown that "no rational trier of fact could have found him guilty." (Id. citing Jackson, supra.) The undersigned can also find no reversible error in the trial judge's refusal to grant a directed verdict on this claim based on this testimony and evidence, or in the state court's upholding this decision on appeal. 28 U.S.C. § 2254(e)(1) [Determination of a factual issue by the state court shall be presumed correct unless rebutted by clear and convincing

evidence]; <u>Wilson</u>, 155 F.3d at 406["[A] federal court reviewing the sufficiency of the evidence on collateral attack must consider the evidence in the light most favorable to the prosecution and must presume that the jury resolved any conflicts over the historical facts in the [state's] favor."].

Based on a review of the evidence presented at trial, the state court's decision was not contrary, nor an unreasonable application of, clearly established federal law. Further, it was not based upon an unreasonable determination of facts in light of the state court record. Thus, this ground is without merit. Therefore, it is recommended that the motion for summary judgment by Respondent be granted with respect to Ground Five.

### GROUND SIX

In Ground Six, Petitioner asserts he received ineffective assistance of trial counsel due to his failure to have Petitioner undergo a mental evaluation by the Mental Health Department.

Respondent disagrees and argues that the state courts' rejection of Petitioner's claim was not "contrary to" and did not involve an "unreasonable application of" clearly established United States Supreme Court precedent.

When presented with an application for habeas relief, the first inquiry by the court is to determine whether the claim raised in the petition was "adjudicated on the merits" by the state court. 28 U.S.C.A. §2254(d). If the claim was properly presented to the state court and the state court adjudicated it, the deferential standard of review set forth in §2254(d) applies and federal habeas corpus relief may not be granted unless the relevant state-court adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceeding." Id. § 2254(d)(1),(2); see Williams v. Taylor, 529 U.S. at 398.

The Sixth Amendment to the United States Constitution guarantees a defendant the right to effective assistance of counsel in a criminal prosecution. McMann v. Richardson, 397 U.S. 759, 771 n.14 (1970). In the case of Strickland , supra, the United States Supreme Court set forth two factors that must be considered in evaluating claims for ineffective assistance of counsel. A Petitioner must first show that his counsel committed error. If an error can be shown, the court must consider whether the commission of an error resulted in prejudice to the defendant.

To meet the first requirement, "[t]he defendant must show that counsel's representation fell below an objective standard of reasonableness." Strickland, at 688. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Turner v. Bass, 753 F.2d 342, 348 (4th Cir. 1985) (quoting Strickland, reversed on other grounds, 476 U.S. 28 (1986)). In meeting the second prong of the inquiry, a complaining defendant must show that he was prejudiced before being entitled to reversal. Strickland requires that:

> [T]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional  errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Strickland, at 694.

The court further held at page 695 that:

> [A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct . . . the court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. (Emphasis added.)

42

In <u>Lockhart v. Fretwell</u>, 506 U.S. 364 (1993), the Supreme Court clarified its definition of prejudice quoted above, stating that "an analysis focusing solely on mere outcome determination . . . is defective." Instead, an appropriate analysis of prejudice should consider "whether the result of the proceeding was fundamentally unfair or unreliable." Therefore, a court analyzing the prejudice prong should not "set aside a conviction or sentence solely because the outcome would have been different but for counsel's error." <u>See</u> <u>Williams v. Taylor</u>, Nos. 98-14, 98-16, 1998 WL 883336 (4th Cir. Va. Dec. 18, 1998) (quoting <u>Lockhart</u>, at 369-70).

The PCR judge concluded the following with regard to this ineffective assistance of counsel issue:

> Regarding whether trial counsel was ineffective for failing to have the Applicant's competency evaluated by the State's doctors to be without merit. Trial counsel articulated that he did not want the Applicant in the hands of the State doctors. Trial counsel testified and the Applicant concurred that the Applicant was found competent by two psychiatrists, who each found him to be criminally responsible and competent. Trial counsel explained, and this Court agrees, that the decision to utilize private psychiatrists, as opposed to state doctors, is a legitimate strategic decision. Trial counsel explained that having the Applicant evaluated by the State would probably provide the State with damaging information, i.e. facts of the crime and exploitable insights into the mental health of the Applicant, as opposed to a more controlled scenario of having the Applicant independently evaluated. Our courts are understandably wary of second-guessing defense counsel's trial tactics. Where counsel articulates valid reasons for employing a certain strategy, counsel's choice of tactics will not be deemed ineffective assistance. <u>Whitehead v. State</u>, 408 S.C. 119, 417 S.E.2d 530(1992). See also <u>Dempsey v. State</u>, 363 S.C. 365, 610 S.E.2d 812 (2005); <u>McLaughlin v. State</u>, 352 S.C. 476, 575 S.E.2d 841 (2003). The Applicant has not shown that counsel was deficient in that choice of tactics. Accordingly, this Court finds Applicant has failed to prove the first prong of the <u>Strickland</u> test–that counsel failed to render reasonably effective assistance under prevailing professional noms. This Court also finds applicant has failed to prove the second prong of <u>Strickland</u>–that he was prejudiced by counsel's performance.

(Tr. 1026-1027).

The state PCR court's findings are not contrary to clearly established federal law or an

unreasonable determination of the facts in light of the evidence in the state court proceedings. Counsel testified that the Petitioner was not evaluated by the state, and he never wanted him evaluated by the State but had him evaluated by Dr. Harold Morgan, a Board Certified Forensic Psychiatrist. Swerling testified that Dr. Morgan said he carried a diagnosis of schizophrenia since early childhood but found he was criminally responsible and competent. Swerling testified that Petitioner relayed to Dr. Morgan in great detail a lot of the facts of the case. Swerling testified that Petitioner is a bright individaul and is lucid having been able to relate in great detail during his testimony at the PCR hearing the facts and things that most people would not remember after all the years that he's been involved in this case. Therefore, Swerling testified that Dr. Morgan felt like he had been compromised in the case to get up on the stand and testify with the knowledge that he had and suggested Swerling contact another psychiatrist for evaluation. Therefore, Swerling contacted Dr. Donna Swartz-Watts, who was also a board Certified Forensic Psychiatrist to evaluate Petitioner. Swerling testified that he considered Dr. Watts and Dr. Morgan to be the two top Forensic Psychiatrists in the State of South Carolina. According to Swerling's testimony, Petitioner was criminally responsible and neither doctor was willing or could say that he was insane or not criminally responsible. Swerling testified, "so that was not an avenue we pursued. And, certainly, if my own doctors who we had hired, Dr. Harold Morgan and Dr. Donna Swartz-Watts, said he was competent and criminally responsible, I was not going to turn him over to the state doctor for evaluation." (Tr. 977). Swerling testified that it was a trial strategy decision based on his experience, and that Petitioner understood completely why he did not get a state evaluation. (Id.)

The PCR judge found counsel to be credible and Petitioner's testimony not to be credible. (Tr. 1026). The undersigned concludes that the PCR Court's determination with regard to the issue

concerning a state mental evaluation was not contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the record. Therefore, it is recommended that Respondent's motion for summary judgment be granted with respect to Ground Six.

## GROUND SEVEN

In Ground Seven, Petitioner alleges ineffective assistance of counsel asserting trial counsel Swerling knew the State had offered a plea agreement to Counsel Hiskar for Petitioner to plead to voluntary manslaughter but Swerling was so interested in the publicity from the media concerning the case, that he advised Petitioner not to accept the plea offer. Petitioner argues Counsel Swerling was ineffective for advising Petitioner not to listen to Counsel Hiskar but to proceed to trial instead of accepting the plea offer.

Respondent counters that the state courts' rejection of Petitioner's claim was not "contrary to" and did not involve and "unreasonable application of" clearly established United States Supreme Court precedent.

In regard to this issue, the PCR court held the following:

> Regarding whether trial counsel was ineffective for failing to properly advise the Applicant and "allow" him to plead guilty to voluntary manslaughter–this Court finds trial counsel's testimony credible that the Applicant never wanted to plead to voluntary manslaughter and if he did want to do so, trial counsel would not have interfered. This Court finds that the Applicant's testimony that trial counsel's advice dissuaded him from otherwise pleading to voluntary manslaughter to be incredible.

(Tr. 1026).

The state PCR court's findings are not contrary to clearly established federal law or an

45

unreasonable determination of the facts in light of the evidence in the state court proceedings. Counsel testified that Petitioner would not plead to anything other than involuntary manslaughter which had not been offered by the Solicitor's office. Swerling testified that Petitioner did not want to reveal where his mother's body was located and therefore could not testify. Further, Swerling testified that a plea of involuntary manslaughter was never offered because they believed he killed his mother based upon the fact that he had cut out holes in the rugs, they found bleach on the back porch, it looked like the area had been cleaned, that people saw him with shower curtains and saw him loading up the lined trunk of the car with garbage bags. Swerling testified "I mean, this was something that obviously the state found pretty disgusting. And so manslaughter was really, I think, a concession on their part because they thought they may have had a problem with no body. I know there was a little concern about that." (Tr. 993-994). Swerling testified that Petitioner would not plea to voluntary manslaughter and involuntary manslaughter was never offered. As previously stated, the PCR judge found counsel to be credible and Petitioner's testimony not to be credible. (Tr. 1026).        The undersigned concludes that the PCR Court's determination with regard to this issue as set out above was not contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or resulted in a decision that was based on an unreasonable determination of the facts in light of the record. Therefore, it is recommended that Respondent's motion for summary judgment be granted with respect to Ground Seven.

### **GROUND EIGHT**

        In Ground Eight, Petitioner alleges that trial counsel Swerling was ineffective "for not

allowing Petitioner to testify." Respondent counters that this allegation is procedurally defaulted because Petitioner did not obtain a ruling on it in the PCR Order of Dismissal and failed to file a Rule 59(e) motion.

A review of the Petitioner's PCR application and the PCR court's Order of Dismissal reveals this issue was not raised before the PCR court and/or not ruled on by the PCR court.[2] Therefore, these issues are procedurally barred on federal habeas review. Wainwright v. Sykes, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (holding failure to preserve issue under state law results in procedural bar on habeas review); Mathews v. Evatt, 105 F.3d 907 (4th Cir.1997) (finding issue procedurally defaulted in state court is procedurally barred on habeas review).

As previously stated, procedural default occurs when a habeas petitioner fails to exhaust his state remedies and the state court would now find the claims procedurally barred. Matthews, supra; Mickens v. Taylor, 240 F.3d 348, 356 (4th Cir.2001). When a procedural default occurs, federal review is barred unless the Petitioner can show cause for his default and resulting prejudice, or actual innocence. Harris v. Reed, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989). Thus, it is procedurally barred from consideration by this Court and should be dismissed. Id.; see 28 U.S.C. 2254; Rodriguez v. Young, 906 F.2d 1153, 1159 (7th Cir.1990), cert. denied, 498 U.S. 1035 (1991) ["Neither cause without prejudice nor prejudice without cause gets a defaulted claim into Federal Court."]; Mazzell v. Evatt, 88 F.3d 263, 269 (4th Cir.), cert. denied, 519 U.S. 1016 (1996) [In order to show prejudice a Petitioner must show that there is a reasonable probability that, but for counsel's

---

[2] If it was raised before the PCR court at the evidentiary hearing and not ruled on by the PCR Court, Petitioner would have needed to file a motion pursuant to Rule 59(e), SCRCiv.P. because Petitioner's collateral counsel did not file a Rule 59 motion to have any of the omitted issues addressed by the PCR court, the issues were procedurally defaulted in state court. Marlar v. State, 375 S.C. 407, 653 S.E.2d 266 (S.C. 2007).

errors, the result of the proceeding would have been different.]; <u>Wainwright v. Sykes</u>, <u>supra</u>; <u>Murray v. Carrier</u>, 477 U.S. 478 (1986); <u>Rodriguez</u>, 906 F.2d at 1159 [a fundamental miscarriage of justice occurs only in extraordinary cases, "where a constitutional violation has probably resulted in the conviction of one who is actually innocent"](citing *Murray v. Carrier,* 477 U.S. at 496); <u>Sawyer v. Whitley</u>, 505 U.S. 333, 348 (1992); <u>Bolender v. Singletary</u>, 898 F.Supp. 876, 881 (S.D.Fla.1995); <u>Lawrence v. Branker</u>, 517 F.3d 700, 714 (4th Cir.), cert. denied, --- U.S. ----, 129 S.Ct. 162, 172 L.Ed.2d 117 (2008). In general, in South Carolina, "absent sufficient reason for not raising a claim in a first [post-conviction relief ("PCR")] application or very rare procedural circumstances, [S.C.Code Ann.] § 17-27-90 [Rev. 2003] bars the claim in a successive application." <u>Matthews v. Evatt</u>, 105 F.3d 907, 916 (4th Cir.1997). As to the procedural default in this case, the Petitioner has not shown sufficient cause and prejudice to excuse the default and cannot show innocence based on his testimony at the PCR hearing. Therefore, it is recommended that this issue be dismissed as procedurally barred.

## GROUNDS NINE, TEN, TWELVE, THIRTEEN, FIFTEEN, SEVENTEEN , EIGHTEEN AND NINETEEN

In Ground Nine, Petitioner alleges trial counsel was ineffective when he failed to move for a change of venue. In Ground Ten, Petitioner alleges trial counsel was ineffective for not moving to sequester the jury. In Ground Twelve, Petitioner alleges trial counsel was ineffective for failing to make a motion to exclude cameras from the courtroom. In Ground Thirteen, Petitioner alleges trial counsel was ineffective for failing to properly object to "Richland County Sheriff's Deputy Kathy Jarvis gave unqualified expert testimony." In Ground Fifteen, Petitioner alleges trial counsel

was ineffective when he failed to give copies of all discovery materials to Petitioner prior to trial. In Ground Seventeen, Petitioner argues that trial counsel was ineffective for failing to properly prepare, investigate, and research prosecution witness Joanne W. Batchelor, the custodian records from the South Carolina Department of Public Safety, and that counsel failed to adequately cross-examine or otherwise refute the inference from her testimony that Petitioner did not have a valid South Carolina driver's license. In Ground Eighteen, Petitioner alleges trial counsel was ineffective for failing to properly investigate and research that he was living next door to a uniformed Richland County Deputy Sheriff when he moved to Confederate Avenue from his mother's former residence, and counsel failed to ask Lt. Howard Hughes and landlord Perna, about this information upon cross-examination. In Ground Nineteen, Petitioner alleges trial counsel was ineffective for failing to properly investigate the case and present evidence that Petitioner "lived and worked in Seattle, WA under his real name and social security number"; that he had his "Social Security benefits check direct deposited in his Washington Mutual Bank account which was there in Seattle, WA under Petitioner's real name and social security number," and that "Petitioner rented an apartment and a post office box where he received mail under his real name and social security number." (Petition).

Respondent argues that each of these allegations are procedurally defaulted under Coleman v. Thompson, 501 U.S. 722, 729-730 (1991), as they were not expressly asserted in the state PCR proceedings, Petitioner did not present testimony on these claims, and none of these allegations were presented to the state supreme court on certiorari.

As these issues were not raised in state court, the issues are procedurally defaulted. Coleman v. Thompson, 501 U.S. 722, (1991).[3] As to the procedural default, the Petitioner has not shown

---

[3] In South Carolina, a "direct appeal is the only avenue for trial related errors of a non-constitutional dimension." Kornahrens v. Evatt, 66 F.3d 1350, 1362 (4th Cir.1995) (*citing*

sufficient cause and prejudice to excuse the default.  In all cases in which a state prisoner has

defaulted his federal claims in state court pursuant to an independent and adequate state procedural

rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the

default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that

failure to consider the claims will result in a fundamental miscarriage of justice. Petitioner has failed

to meet this burden. Thus, these issues are procedurally barred from consideration by this Court and

should be dismissed. Id.; *see* 28 U.S.C.  2254; Rodriguez v. Young, 906 F.2d 1153, 1159 (7th

Cir.1990), *cert. denied,* 498 U.S. 1035 (1991) ["Neither cause without prejudice nor prejudice

without cause gets a defaulted claim into Federal Court."]; Mazzell v. Evatt, 88 F.3d 263, 269 (4th

Cir.), *cert. denied*, 519 U.S. 1016 (1996) [In order to show prejudice a Petitioner must show that

there is a reasonable probability that, but for counsel's errors, the result of the proceeding would

have been different.]; Wainwright v. Sykes, supra; Murray v. Carrier, 477 U.S. 478 (1986);

Rodriguez, 906 F.2d at 1159 [a fundamental miscarriage of justice occurs only in extraordinary

cases, "where a constitutional violation has probably resulted in the conviction of one who is

actually innocent"](citing *Murray v. Carrier,* 477 U.S. at 496); Sawyer v. Whitley, 505 U.S. 333,

348 (1992); Bolender v. Singletary, 898 F.Supp. 876, 881 (S.D.Fla.1995).  Therefore, it is

recommended that the Respondent's motion for summary judgment be granted with regards to

Grounds Nine, Ten, Twelve, Thirteen, Fifteen, Seventeen, Eighteen, and Nineteen.


## GROUNDS ELEVEN AND FOURTEEN

In Ground Eleven, Petitioner alleges the trial judge erred by denying counsel's motion to

---

Simmons v. State, 254 S.C. 417, 215 S.E.2d 883, 885 (1975)). If "a defendant fails to raise a trial
related error on direct appeal, he has defaulted the claim." Id. at 1363.

sequester the witnesses during trial. Petitioner asserts the prosecution's "witnesses were allowed to sit in courtroom and listened to and glean information from witnesses who had already testified thus contaminating and tainting those witnesses and their testimony."  In Ground Fourteen, Petitioner alleges the trial judge erred by not removing the Fifth Circuit Solicitor's Office from prosecuting the case against him based on an alleged conflict of interest. Respondent argues this issue is procedurally defaulted because Petitioner did not present it to the state supreme court on direct appeal. (Petition).

 Petitioner did not raise these issues at trial or on direct appeal. (See Order of Supreme Court of South Carolina filed January 17, 2006). Therefore, these issues were not preserved under state law and are procedurally barred on habeas review. Wainwright, 433 U.S. at 87 (finding failure to preserve issue under state law results in procedural bar on habeas review); Anderson v. Harless, 459 U.S. 4, 103 S.Ct. 276, 74 L.Ed.2d 3 (1982) (holding federal constitutional claim must be explicitly raised in state proceedings); Wainwright v. Sykes, 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977) (holding failure to preserve issue under state law results in procedural bar on habeas review).

Petitioner has not shown sufficient cause and prejudice to excuse the default.  In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. Petitioner has failed to meet this burden. Thus, Grounds Eleven and Fourteen are procedurally barred from consideration by this Court and should be dismissed. Id.; see 28 U.S.C. 2254; Rodriguez v. Young, 906 F.2d 1153, 1159 (7th Cir.1990), cert. denied, 498 U.S. 1035 (1991)

["Neither cause without prejudice nor prejudice without cause gets a defaulted claim into Federal Court."]; Mazzell v. Evatt, 88 F.3d 263, 269 (4th Cir.), *cert. denied*, 519 U.S. 1016 (1996) [In order to show prejudice a Petitioner must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.]; Wainwright v. Sykes, supra; Murray v. Carrier, 477 U.S. 478 (1986); Rodriguez, 906 F.2d at 1159 [a fundamental miscarriage of justice occurs only in extraordinary cases, "where a constitutional violation has probably resulted in the conviction of one who is actually innocent"](citing *Murray v. Carrier,* 477 U.S. at 496); Sawyer v. Whitley, 505 U.S. 333, 348 (1992); Bolender v. Singletary, 898 F.Supp. 876, 881 (S.D.Fla.1995). Therefore, it is recommended that the Respondent's motion for summary judgment be granted with regards to Grounds Eleven and Fourteen.

## GROUNDS SIXTEEN AND TWENTY

In Ground Sixteen, Petitioner argues that trial counsel was ineffective for failing to properly prepare for trial, failing to investigate, and failing to research the prosecution witness, Toni E. Franchey, Petitioners sister and daughter of the victim. Respondent asserts this issue is procedurally defaulted under Coleman because Petitioner failed to present this issue to the PCR judge and failed to present it to the state supreme court on certiorari.

In Ground Twenty, Petitioner asserts trial counsel was ineffective "for failing to make a motion to trial court Judge C. Thomas Cooper, Jr. to recuse himself as trial court judge at Petitioner's trial, after Judge Cooper had been prejudiced against Petitioner, and made remarks showing prejudice against Petitioner during an in camera hearing before Petitioner's trial." (Petition). Respondent argues this issue is procedurally defaulted under Coleman because he did not

present it the PCR judge and, more importantly, he failed to present it to the state supreme court on certiorari.

Petitioner did not address Ground Sixteen of ineffective assistance of counsel in his petition for writ of certiorari to the state supreme court and did not receive a ruling. Petitoner did not raise the issue in Ground Twenty in this application for PCR or in his petition for writ of certiorari to the state supreme court. Therefore, these issues were waived and abandoned in state court and are procedurally barred on habeas review. Wainwright v. Sykes, 433 U.S. at 87 (finding failure to preserve issue under state law results in procedural bar on habeas review); Coleman v. Thompson, 501 U.S. 722, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991) (finding failure to properly appeal issue to state appellate court results in procedural bar on habeas review); Mathews v. Evatt, 105 F.3d 907 (4th Cir.1997) (holding issue procedurally defaulted in state court is procedurally barred on habeas review).

Petitioner has not shown sufficient cause and prejudice to excuse the default.  In all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claim is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. Petitioner has failed to meet this burden. Petitioner fails to articulate cause for procedurally defaulting on his grounds. Petitioner had the opportunity for a direct appeal, a PCR hearing, and an appeal from the PCR in which to raise these issues and he failed to raise them, raise them properly, or preserve these issues for habeas review. Petitioner cannot establish cause and prejudice because he has consistently abandoned opportunities to preserve these specific issues.

Further, Petitioner has not shown actual innocence. Thus, Grounds Sixteen and Twenty are procedurally barred from consideration by this Court and should be dismissed. Id.; *see* 28 U.S.C. 2254; Rodriguez v. Young, 906 F.2d 1153, 1159 (7th Cir.1990), *cert. denied,* 498 U.S. 1035 (1991) ["Neither cause without prejudice nor prejudice without cause gets a defaulted claim into Federal Court."]; Mazzell v. Evatt, 88 F.3d 263, 269 (4th Cir.), *cert. denied*, 519 U.S. 1016 (1996) [In order to show prejudice a Petitioner must show that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.]; Wainwright v. Sykes, supra; Murray v. Carrier, 477 U.S. 478 (1986); Rodriguez, 906 F.2d at 1159 [a fundamental miscarriage of justice occurs only in extraordinary cases, "where a constitutional violation has probably resulted in the conviction of one who is actually innocent"](citing *Murray v. Carrier,* 477 U.S. at 496); Sawyer v. Whitley, 505 U.S. 333, 348 (1992); Bolender v. Singletary, 898 F.Supp. 876, 881 (S.D.Fla.1995). Therefore, it is recommended that the Respondent's motion for summary judgment be granted with regards to Grounds Sixteen and Twenty.

## VIII. CONCLUSION

Based on the foregoing, it is recommended that Respondent's motion for summary judgment (docket entry #21) be GRANTED and the Petitioner's Petition for Writ of Habeas Corpus should be denied, and the petition dismissed without an evidentiary hearing.

Respectfully submitted,

s/Thomas E. Rogers, III
Thomas E. Rogers, III
United States Magistrate Judge

January 26, 2011
Florence, South Carolina

**The parties' attention is directed to the important notice on the next page.**

54